I appreciate your arguments, and we'll turn to Herlihy v. Sandals Resorts. Okay, Mr. Moses, you're on. Thank you, Your Honor. Good morning. My name is Bryce Moses, and I represent the appellant in this case, Scott Herlihy, who in June of 2016, while at a Sandals Resort in St. Lucia, there to attend his daughter's wedding, stood beneath a tree when a limb fell, crushing his leg and foot. That limb came from a diseased and rotting tree. There was no warning. There was no notice. Seven surgeries later, we're here, before this court, because Sandals is claiming they don't do business in Connecticut. Sandals advertises in Connecticut on their airways, TV. They publish ads in magazines and newspapers, all delivered to my client's home. They have dedicated, specialized agents who are trained by Sandals to obtain the title of a specialized Sandals agent. They are given promotional materials by Sandals, even a car wrap, so they can drive around Connecticut promoting Sandals' interests. Yet, we're here because the district court found and required an element that simply is not required. The district court found that minimum contacts were insufficient to hail Sandals into Connecticut because the minimum contacts in Connecticut did not cause this injury. That is an element that is simply not required by the Supreme Court. All that we need to show is that Sandals' contacts with the forum state were related to the basis of the lawsuit. How can one say that a company such as Sandals, who has dedicated sales representatives on the ground in Connecticut, in Stanford and Greenwich, who openly solicit Connecticut residents to come visit their resorts all over the world, how can we not say that that conduct is related to what gave rise here? So your client booked through JetBlue. Correct. And he was not actually staying at the Sandals resort where he was injured. He was staying at a Sandals resort. At a Sandals, but not this one. Yes, that's correct, Your Honor. He was staying at a different Sandals resort in St. Lucia. But the fact that he was simply staying at a different resort doesn't end the analysis. The advertising and the contacts that were being put forward by Sandals in Connecticut were all related to those properties in St. Lucia. How can Sandals say they didn't expect to be brought into a Connecticut court to defend a lawsuit brought by a Connecticut resident when they were spending these efforts to solicit these residents to visit their resorts all over the world, including St. Lucia? You're suggesting for a second time in your argument that Connecticut would have jurisdiction over any case of this sort anywhere in the world because Sandals is active advertising for resorts all over the world. No, I'm not, Your Honor. What I am specifically saying is Connecticut would have jurisdiction for actions brought by Connecticut residents, which is an important distinction to be made because the defendants rely upon the Supreme Court decision in Bristol-Myers, but that dealt with non-residents. Scott Herlihy is a resident of Connecticut, so what I am proposing, Your Honor, is that Connecticut would have jurisdiction for lawsuits brought by Connecticut residents against St. Lucia for torts that under specific personal jurisdiction. Under specific jurisdiction. Yes, Your Honor. And the second prong of that analysis, Your Honor, to allow your concerns about opening up a floodgate of litigation is the conduct that gives rise to the action needs to be related to what the advertising is and what the contact is. Here they're advertising the resorts. The lawsuit here arises out of the negligence in properly maintaining that resort. It's not the case that Your Honor has decided involving DiLorenzo, involving somebody that had no connection to the contacts. This is a situation in which the very advertising has to do with the resort. If Mr. Herlihy was at a tiki bar three miles from the resort and slipped and fell, we wouldn't be here. This actually happened on the resort. This is a result of their failure to maintain the resort, the very same resort they're advertising on the Internet through their specialized travel agents. And for Sandals to say it's fundamentally unfair for them to be brought into Connecticut court because they simply didn't anticipate being brought into Connecticut kind of belies common sense when their entire corporate structure is designed to avoid liability in Connecticut. They have agents upon agents upon agents, and they sit there and they maintain we simply didn't know. So what if the wedding venue was at a non-Sandals resort? Still have jurisdiction? No. Okay. So it's just because the daughter chose to have her wedding at Sandals that he has a cause of action against Sandals? No, Your Honor. It's because Sandals chose to advertise in Connecticut to Connecticut residents and a Connecticut resident was on Sandals' property. It doesn't have to be specifically to the plaintiff. In fact, this Court has disregarded that analysis. It's not based on the contacts with the plaintiff. It's based on the contacts with the forum state. And here the contacts in Connecticut are substantial. The contacts in Connecticut are thorough and specifically designed to do what occurred here, solicit residents to our resort. Whether they came there directly or not. Could there be a little bit more of a causal relationship between the injury here and the contacts? No, Your Honor. There's not a but-for analysis here. The Supreme Court language in Bristol-Myers Squibb specifically rejected the causal relationship analysis. Justice Sotomayor specifically stated in her dissent that the Court chooses not to take this as far as a but-for analysis. That was rejected. That's what Bristol-Myers tried to get the Court to adopt. That was rejected. It needs to be related to, and here's why. Because the whole basis of this analysis is premised on fundamental fairness. And if it's not related to the contacts in the forum state, it's understandable that it would be unreasonable to bring a defendant into a state that they have no contact with. But when the contacts are related to the basis of the lawsuit, how can you say it's fundamentally unfair? How can you say it's unforeseeable? How can you say Sandals didn't know that the people that they solicit in Connecticut might bring them home to Connecticut to answer for their negligence? Thank you. May it please the Court. Tom Scott on behalf of the defendants, Latak and SRI. Your Honor, Judge Myers, the judge in the lower court, wrote a very tight and astute order which correctly recites the law and the evidence in the case and reaches the correct conclusion. Judge Myers began by saying, okay, under a personal jurisdiction analysis, there's a long-arm statute requirement, there's a due process. He avoided the problem of analyzing the Connecticut statute. He went directly to the due process. He then went to the due process and said, under the due process consideration, I'm not going to consider the second element, reasonable inquiry. I'm going to consider the first element, minimum contacts, because that's the specific issue in this case. He considered the minimum contacts question. Under the minimum contacts question, the first issue was the general jurisdiction. At the time of oral argument, and the transcript is not in your record, but it's in the record below, but at the time of the oral argument, plaintiffs conceded there was no general jurisdiction. So it went specifically then to the issue of the specific, and that was what the case turned on. Now, pardon me? Exactly. So that's where we're at right now. So let's talk just briefly about the facts. There is evidence adduced by Sandals which was uncontested, uncontroverted, in which Latok is a hotel. It does not solicit. It does not do anything. SRI is a management company. It does not solicit. It does not do anything. Neither of these companies, either Latok or SRI, have anything to do with the State of Connecticut. Neither maintains office here. They don't solicit business here. They don't have a target Connecticut here. They don't have any contacts here whatsoever. Was there not an agency? Pardon me? Was there not an agency argument that was made to try to tie them all together?  And I'm going to address that, Judge. Sandals has two corporations that handles the travel and promotions. One is UTC. It's worldwide. It's a Panamanian corporation. It's a standalone company. Sandals has nothing to do with UTC. UTC entered into a contract with UVI, an American corporation. And this is all in the record uncontroverted. UVI does the promotion and travel and things of that nature. UVI runs the website. UVI has contacts with the travel agents. UVI does everything, an American corporation in Connecticut. Not SRI, not Latok. There is no record evidence of that. Let me suggest the evidence of my television set as a Connecticut resident. I see an awful lot of ads for precisely this locale by Sandals Resorts. And that's not significant? It's not part of the record? But that's part of the record. Absolutely. But my clients, the two companies that have been sued in this case, have no relationship to that. They have nothing to do with that. Those are separate corporations that do that, not Sandals. Yes. So. Was there a request for jurisdictional discovery on the agency issue? Yes. There was. And the judge under under. It was denied? It was denied because of the fact that he did not find a prima facie case of a relationship of an agency relationship. There were no specific facts. It was a conclusory allegation. And that's what he found. And that's what it shows. And the record completely supports that. So he felt that under an abusive discretion standard, there was no need for discovery here, because there was no evidence if accredited that would absolutely support this situation here. And in. If you're so certain about that, I suppose you would have no great concern about having a remand to Judge Meyer to permit a limited course of discovery on that question, right? Judge, I don't think it's required in this case. I honestly don't. I don't think it was required. I'm just suggesting that if such strong and vivid views on the matter, it appears that you would have no concern in achieving your objective in the district court. Judge, I don't believe that under an abusive discretion standard and under the requirements which they have to show a prima facie case, specific non-conclusory allegations that that was established. And it would be wrong for the Court to find that he abused his discretion. In one of the cases that was cited by. Alito, what was the shortfall? That is, what was the problem with the allegation relating to or allegations relating to agency? There were no allegations. Actually, I don't. And counsel can correct me. I don't even think that the complaint contained an allegation of agency. That was something he raised. I could be wrong because there's a request in his reply brief that if they remand, he'd like to amend to include an agency. So there wasn't even an allegation of agency. It was of ownership. And we didn't and they didn't own the company. It had nothing to do with the company. Why I ask these questions is that you are focused on the lack of agency, correct? Yes. Yet there was a denial of a request for jurisdictional discovery on that issue. There was a request, and he denied it because he did not think there was a prima facie showing for that basis. But there's also another question, Judge, which you're going to have to consider on this agency issue, and that is, under specific jurisdiction, is agency even a plausible theory? You know, in Gamler, they suggested very strongly, they suggested very strongly in a general jurisdiction setting that that agency should not be considered. And in this Court, in the case of Scenera Holding, which is cited in our brief, said the Second Circuit observed that Gamler, the Supreme Court, expressed doubts as to the usefulness of an agency analysis that focuses on a forum, States, affiliates, importance to the defendant, other than on whether the affiliate is so dominated. And I will tell the Court that there have been other decisions nationwide holding that as a matter of law in post-Gamler. There is no longer an agency relationship theory, an agency relationship theory that you could even plead. So there's a legal hurdle right there that they have to be able to establish that that agency theory is viable. We also cited other law in our – that said that a defendant's relationship with a third party standing alone is insufficient basis for jurisdiction. That's U.S. Bank. And that sparse allegations of agency, just like in this case, if there were any at all, are too conclusory to make out a prima facie case for showing of it. So – and then it said, to attempt an agency jurisdiction, plaintiffs must allege – this is another case by this Court – must allege the actual exercise of the control based upon the realities of the relationship. That was the Ho Yin case, which we cite in our brief. Here, there is no realities of relationship because there is no relationship. These are separate, stand-alone companies that have nothing to do with that. And this Court, in a case in 1988, Jan Zinzi, J-A-Z-I-N-I v. Nissan Motor Company Corporation, specifically held that where a corporation uses, in that case, subsidiaries – we don't even have that here, we have separate corporations – to insulate itself from liability, which is one of the concerns of one of the panel members, that there's nothing wrong with that, that that's the law and they're entitled to do it. Here, that's exactly what happened. So from a factual standpoint, they have not established – they have not established any type of agency, let alone plethora. From a – and from a legal standpoint, there is good law questioning whether even an agency relationship in a specific personal jurisdiction can lie. And I believe it cannot lie. So for both factually and legal reasons, it's my position and my client's position that the Court should reject that particular contention. You know, Judge, UTC and UVI are not subs. They're separate companies. Latok is a management company, is a hotel owner. SRI is a management company. They have nothing to do with these ads. They cannot be hailed into this Court. And in viewing the issue of specific jurisdiction, you have to – you have to view the defendant's conduct and protect the defendant under due process standards. Here, this judge looked at the law. He looked at the Bristol-Myers and the Walden case, and he said there has to be a direct connection to the cause of action. He looked at two cases or three from your Court, Charles Schweb and Bank Holding v. BOA. They said the same thing. And he looked at a case that this Court decided just a year ago, DiLorenzo, which is very factually similar. It's a sexual assault on Antigua. And they made the same allegation, website advertising. It was rejected by this Court and it was affirmed, and there was a request for discovery in that case, and it was denied. I might also point out, Judge Reese, that you've written two opinions in the last year on this issue in 2018. One is called Hedgeman and one is called Vinci. And in one of those cases, both you rejected the idea of this same issue and you rejected the concept of the agency and discovery. I think that was in the Vinci case, a 2018 decision. So in sum, UTC and UVI are separate. There is no evidence and there is no specific allegations of any type of an agency relationship. Agency should not even apply in personal jurisdiction. And the fact, as the Court concluded, that this tree fell on him in a distant, faraway island is the exact standard under which Bristol-Myers, your own cases, and the Lorenzo case found no specific personal jurisdiction and denied discovery. We ask the Court to do the same thing. Kennedy. Mr. Scott, just a clarifying question. Sure, Judge. Are you connected to Fitzpatrick and Hunt or you are separate counsel? I am separate counsel from Miami, Florida, Southern District of Florida. I practiced down there 40 years. And because the Fitzpatrick lawyer got sick, I came in to pinch hit for the day. Just a clerical question. No. Are you admitted pro act vitae for this case? Yeah. Judge, I have — I'm an ex-Federal judge. And, you know, so I've been — In the Southern District of Florida. Southern District of Florida for seven years. I was U.S. attorney down there and I was on the Court for seven years before I left. So, I mean, I have been around the block. And I have a great belief in, you know, trial court discretion, as you can probably tell from my argument. And I thought this judge wrote a good order and went right to the point. Thanks very much. Have a nice — thank you for the time. Mr. Moses. Mr. Moses, is it the case that the district court, at oral argument, hurriedly abandoned his claims against defendant Sandals Resorts International? That's correct. Yeah. What's the significance or non-significance of that? It's non-significant, Your Honor. The two remaining entities are the ones that bear responsibility for the happening of this accident. The three original entities that were named were found by, through investigation and through due diligence, we realized that one of them were simply a, for lack of a better word, a company offshore located in Jamaica that is a bit of a shell corporation. We don't believe they have any affiliation with this particular resort. The two resort entities that were named have direct connections to this resort. I, with the Court's indulgence, want to just address a few of the issues that counsel brought up. First and foremost, the DiLorenzo case that they cite. This Court did not in any way find that specific jurisdiction failed to be met due to lack of minimum contacts under due process. That case was specifically found that the New York long-arm statute did not apply. It was not based on due process. Taking a look at Unique Vacations and their relationship with Sandals, I indulge the Court the next time perhaps, Your Honor, you see a Connecticut TV ad, jump on the website, because if you take a look at the website, this corporation that has no affiliation with Sandals, use words such as, we are the worldwide representative of Sandals International, our chairman, our CEO, and our family of resorts. This is not an independent separate company under an agency theory. We would like a shot at ---- Your colleague says that the district court judge determined that there was not even a prima facie case, so you weren't entitled to jurisdictional discovery on that. I would disagree with that finding, Your Honor. We do believe it was an abuse of the lower court's discretion not to allow us, based on the record from pages 312 to 325, where we submit outtakes from the website, representations made on the website about the CEO, about the relationship between these resorts, we believe that an opportunity to conduct jurisdictional discovery would at least give us an opportunity to demonstrate to the lower court the exercise and control that Sandals had over these companies. It's hard ---- Yes. So the district court judge says that Hurley, Hurley does not allege that he dealt with any of these Connecticut-related agents or that there is any connection between these agents in his lawsuit. And Hurley, Hurley, he does not suggest that Sandals, LaTarka are domiciled and so on, on and on and on. But then there's also, I'm trying to find a line, that your client did not allege anything about agency. Well, our client did allege that the tickets were purchased through JetBlue that offered Sandals packages to my client at specific Sandals resorts, including the Sandals resort where the accident happened. We asked for ---- Where is the allegation about, the relevant allegation about agency? The specific word, Your Honor, with regard to agency or the theory of liability? Point me to somewhere in the complaint that talks about the agency between the defendants and Sandals here. I don't believe in the complaint there was an allegation of agency between ---- Well, isn't that the problem? Well, Your Honor, I believe that the allegations that were brought out in our opposition through testimony that Sandals, through their agency, induced Connecticut residents to travel to St. Lucia was certainly enough to at least provide us with the opportunity to conduct discovery on the issue. What's the decree that you asked this Court to issue? Your Honor, it is our position that the lower court erred in not finding sufficient minimum contacts. We believe the lower court added an element that the Supreme Court never required, simply being ---- You only want, at this point, you would be satisfied with the opportunity for jurisdictional discovery. We'd be thrilled with that opportunity, Your Honor. We'd be even more thrilled if the Court would find sufficient jurisdiction so we could proceed with discovery on this case. But to summarily dismiss our opportunity to at least investigate the agency relationship between these two companies and Sandals, we believe is an abuse of discretion. Thanks very much. Thank you, Your Honors.  Appreciate your arguments both. Thank you, Judge. We'll hear U.S.A. v. Muhammad Mahmoud al-Farrakh. May it please the Court, I am Lawrence Mark Stern, and with me is Robert Boyle. We are here representing the appellant Muhammad al-Farrakh. And the record will reflect that before coming into open court this morning, we had the opportunity to have an ex parte hearing in the roving room. And as part of that hearing, Mr. Stern and his colleague gave us the benefit of their views, all of this material being under seal until further order of the Court. Go ahead. Time permitting, Your Honors, and with your permission, I would like to address two core issues in the case, one of which is the clearly erroneous failure of the district court to consider the whole record on the issue of suggestive identification and its omission of salient facts that were reduced in that record of suggestive identification, and indeed his consideration, according to his opinion, of matters outside the record which were not introduced during the Wade hearing. And two, the failure of the Court to apply to its preclusion of defense cross-examination of the fingerprint expert its own rule, which it invoked in favor of the prosecution, that when the jury would struggle enormously with its biases and preconceptions on a matter, it should be allowed to hear about other cases that address that bias and that preconception. The first of these issues is the one which, as I understand it, the Court will address in a closed session. So I will address the second one first, and then we'll take the break as I understand the procedure. That first issue is about whether or not the Court balanced its rule, its own rule that it created in this case, and I'm using its words, when the jury would struggle enormously, quote, unquote, with its preconceptions about whether or not a clean-cut kid could become a terrorist, an issue which, as I understand it, wasn't even raised in the case, then the government would be allowed to bring in an expert to testify about other cases to tell the jury that, in fact, essentially a clean-cut kid could become a terrorist. And hence permitted the testimony of an expert named Zedino to testify that he'd that anybody essentially could be a terrorist. But when it came to the fingerprint request during the examination of the fingerprint expert for the prosecution, that the defense wanted to question the expert about the now conclusion for many, many months that two people, two different people had the same fingerprint, when the defense asked to bring that report to the attention of the jury through cross-examination of the fingerprint expert, given the bias and the preconceptions that juries have that fingerprint evidence is infallible, that it's a science, that there's absolute certainty about it, notwithstanding that preconception and that bias, and the fact that the jury would struggle enormously to overcome that, the court precluded admission of the Mayfield report or cross-examination of the fingerprint witness about the Mayfield report. Both situations, the Zedino testimony about his interviews with 30 terrorists and the Mayfield report deal with another case and other cases, and this was the reason the court said it was precluding examination using the Mayfield report, that it's another case. It's going to distract the jury with other cases. Well, with the Zedino, he didn't say, I interviewed this person, and I found X, Y, and Z, and then I talked to this other person, and these were her characteristics. He didn't go into he just said there is no stereotype of who becomes a terrorist. It can be anybody. And what you wanted to do is not just introduce that there could be a mistake with fingerprints, which you got in on cross, but in that particular case, using different agents, they had made a mistake, and it would have required some background into those individual characteristics of what happened in that case. So are those different situations, or how would you harmonize just a general opinion, no stereotype of a terrorist, as opposed to going into the specifics of a case and talking about what happened there, what was wrong there? I think, Your Honor, that the what was supposedly a no-profile testimony about Zedino became a profile testimony, in that now the court's question, could a clean-cut kid, as apparently Mr. Alfurek looked like to the jury, become a terrorist? The answer is, according to our profiles, a clean-cut kid can be a terrorist. So indeed, these other cases informed this profile, which was presented to the jury, don't worry about that. This defendant could be a terrorist, as much of the other evidence in the case was about could-bes. Could be this, could be that, could be his hair, could be his handwriting. No definite opinions, but a lot of could-bes. Here, with the Mayfield report, which the water the FBI itself in the report said is a watershed case, the first time that two people, Mayfield, Zedino, and Mayfield, and the actual bomber in the Madrid bombing case, shared at least ten points of characteristics, at least the experts thought so, for many, many months, until finally the FBI withdrew the Mayfield identification, but for many, many months, contrary to my childhood, I think the courts as well, fingerprints don't lie. Well, here were two people with the same fingerprints, according to the FBI and according to the Spanish authorities. In fact, Your Honors, the FBI met with the Spanish authorities and were not convinced at first that their conclusion was wrong. It was important, absolutely important for the jury to know this if there was going to be any substance to a cross-examination of a fingerprint expert. In fact, the perceptions are so strong that this court, in the case of Farhane, said that it was plausible for a prosecutor to use a Batson challenge against a juror who watched a lot of television. It was okay to excuse that juror because he was going to expect infallibility, infallible scientific testimony in the case. The American Association for the Advancement of Science has repeatedly said that the public perception has been shaped by decades of overstatement by fingerprint experts. Most people think fingerprints are infallible. The FBI itself said that fingerprints are the gold standard of forensic science. Absolute certainty. Now, what about the significance of that? The government cites the case of United States against Mitchell, pardon me, in the Seventh Circuit, a case in which there was a full blown attempt by the defense in that case to make a daubert finding that fingerprints were not science and shouldn't be admitted as such. The conclusion in the case was, well, most factors don't disfavor the admission of fingerprints. However, in that case, which was handed down before the Mayfield report, there were no false positives. The Court held nobody has ever heard of a false positive in fingerprints. That was the basis of the decision in Mitchell. Are you aware of a district court that in the context of a trial, or even in the context of a trial proceeding, has permitted the defense to either refer to or try to deny the evidence or try to deal with the Mayfield report? There are two circuit opinions, one in the Seventh Circuit, both in the Seventh Circuit, actually, which have upheld the preclusion of the Mayfield report. But in one of them called Rivas, defense counsel was allowed to address all of the mistakes and the problems that the Mayfield report brought up, but the preclusion was about the Mayfield report itself. There's another one in the Seventh Circuit called Bonds from 2019, actually. But they haven't had — that court didn't have the advantage of the American Association for the Advancement of Science's recent report in 2017 based on Mayfield concluding, finally, fingerprints are not science, plain and simple, that there's no scientific basis for concluding that two people can't have the same fingerprints. So in this — what was the significance? I did thank you as a way of wrapping up your oral argument. No, it's fine. It's fine. So this is the time to take the break, then? Well, we'll hear to opposing counsel, and then we'll hear your motion for a meeting in camera. Can I have some rebuttal to them on this issue? Yes, sure. You've reserved some time. May it please the Court. My name is Richard Tucker. I'm an assistant United States attorney in the Eastern District of New York. I also represented the government at trial in this matter. I think the Court has anticipated my two responses on these two tenuously related issues. Dealing first with the fingerprint evidence, I think it's important to note just from the outset that the Mayfield case, which, as Your Honor noted, involved different FBI personnel and very different facts, including — and this is the point I want to make — in that particular instance, in the Mayfield case, there was a single fingerprint match. And in this instance, the government induced at trial evidence that there were 18 fingerprint matches. That is, fingerprints from Ferrec. In this — in the instant case? Yes, Your Honor. On the brown packing tape that was recovered from the unexploded vehicle-borne improvised explosive device that was used to attack Forward Operating Base Chapman. As I think the argument itself illustrated, it takes a substantial amount of time to even explain the facts of the Mayfield case. And in a case like this, where the defendant's conduct spanned continents and more than almost a decade, Judge Kogan correctly ruled that allowing this frolic into a completely unrelated case was going to run the risk of potentially confusing the jury and the complicated facts before it. Now, that said, Judge Kogan was careful to permit defense counsel to pursue the substantive lines of cross-examination that I think Mr. Stern has articulated here today. And the theme throughout much of the defense in this case was one of subjectivity. That theme was throughout the cross-examination of the fingerprint evidence and continued through the closing argument. The idea that mistakes could happen was elicited, and the fingerprint expert did not contest that, that there was an element of subjectivity in her process. She explained her process in detail, and she acknowledged that mistakes could happen. There's absolutely no basis to overturn Judge Kogan's ruling that precluded defense counsel from pursuing this totally unrelated constellation of facts involving different people with a significantly smaller quantity of evidence. Just because Dr. Vedino's testimony was raised, I'd like to address that briefly. And Your Honor, again, anticipated my points. Dr. Vedino's testimony, the vast majority of it, related to questions about the history of al Qaeda, the structure of al Qaeda's leadership, the location of al Qaeda training facilities, and the means by which individuals traveled to those facilities. The discussion about whether there was a specific profile for an individual who could radicalize was at the very conclusion of his direct examination. It was really not a core part of what his testimony involved. And also, as Your Honor identified, and just so everyone's clear, there was absolutely no discussion of other terrorists that Dr. Vedino had interviewed specifically by names or the nature of their conduct. And Judge Kogan, again, was extremely careful, both with respect to Dr. Vedino and with respect to the testimony of our other witnesses, to make certain that we stayed focused as much as we could on the facts involving this case, again, to avoid undue delay and complicating what was already a factually rigorous case. So I think the analogy fails here. I do not believe that the idea of allowing this one bit of testimony from Dr. Vedino, which, as Judge Kogan noted, had some probative impact and almost no prejudicial effect, is in any way comparable to the Court's ruling excluding this completely unrelated incident with different people and a different quantum of proof. Obviously, there were other issues raised in my adversary's brief. I'm happy to address any of those other issues if the Court has questions. But otherwise, I will sit down. Thanks very much, Your Honor. I understand that the government and their friends on the other side have a joint motion for argument in the robing room. And based on our earlier discussion of the matter, which is part of the record, the Court is prepared to grant that joint motion, and we will repair to. Do you want to move on? Yes. Oh, I'm sorry. Yes, Mr. Sotomayor. I'm sorry. You did want a bit of time to reply. The fingerprint expert was able to testify without challenge that fingerprint experts, the fingerprint examination is accurate and reliable. Who should have challenged it? The defense was attempting to challenge it. I see. Well, you got cross-examination. Pardon? You got to cross-examine. Yes, but not with the ability to show that, according to Mayfield, that's not true. It seems like what you got through the cross-examination was an acknowledgment that fingerprint analysis is imperfect. No, that fingerprint examiners make mistakes. But she also presented herself, and five times it was referred to, she referred to herself as a forensic scientist, five times in the record. She introduced herself. She was questioned as a forensic scientist when Mayfield and its progeny say there's no science to it because there's no evidence that, in fact, two people don't share the same fingerprints. She was able to say that she made a side-by-side comparison of Mayfield's print with the latent prints when, in fact, that's the very thing that the Mayfield report criticized the FBI for doing. It's a confirmation bias when the suspect's print is compared to the latent. She was able to say that the ten-point comparison is a legitimate basis when Mayfield said ten-point comparison in both cases didn't sufficiently identify the prints. She was able to say that no two people have the same print, which Mayfield itself said it's extraordinarily rare, but it happened in this case, that as far as our analysis, two people did have the same print, at least until they finally said no. Research has shown, she said, that this is accurate and reliable evidence, but the National Association, the American Association, they all say there's no reason to believe that at all. But we were precluded from bringing that to the jury. She was able to say that her findings was an identification. She made an identification that two friction ridge prints originated from the same source. That should not be said, says the American Association for the Advancement of Science. All of these things were precluded because we couldn't show the very report from which this extraordinary, as the FBI itself said, extraordinary evidence, watershed evidence of how fingerprints are not scientific and the jury shouldn't expect them to be infallible. Thank you very much, Mr. Stern. Now, I want the record to reflect also in connection with the oral argument, which we will hear momentarily in the cloakroom, that we have a letter of December 9, 2019 on the letterhead of Mr. Boyle, who, of course, is present with us today, but signed in behalf of Mr. Boyle and Mr. Stern, and that's part of our record. So let us recess briefly, and we'll return to open court as quickly as appropriate. Mr. Tucker, please. This court in Alcantara set forth the requirements that the court needs, the findings the court must make to properly seal a district court. I presume those rules would apply here. Your Honor will tell me if I'm presuming them. Yes, indeed. And this is a joint motion, and I think we're in agreement that all of the factors in question are part of the record and that we are in agreement that they have been met. But if you want to restate them for the record, we're delighted to hear them. I appreciate that, Your Honor, and I think I can do so succinctly. The court must find that there is a substantial probability that the public argument would prejudice a compelling interest of the government, the parties, or a third party. That's the factual point that I want to make. In our sealed – in the Tucker affidavit, which is part of the court's sealed appendix, at pages sealed 5 and 6, we identify that individuals in similar circumstances as the witness in the deposition have been in danger and their family members have been in danger in the past if the fact of their cooperation was made known. I also will just make a note for the record that certain techniques employed here are potentially sensitive, and there is a compelling U.S. government interest to avoid those becoming public. I believe that there is no reasonable alternative to closure in this matter, given the dynamic nature of oral argument and the importance that appellants' counsel have the ability to answer Your Honor's questions. I believe that we have devised a narrowly tailored approach to this inasmuch as we've had some oral argument in open court already, and I would submit that the prejudice is overriding of the qualified First Amendment right to access. So I think if Your Honor agrees with those propositions of fact, then I think the record is more than adequate. I believe the members of the court do agree, and it is the case, is it not, that you have asserted the State secret doctrine. Thank you. Anything else to be put on the record? Mr. Boyle? Mr. Stern? Thank you very much. The court is in recess until we're reconvened as quickly as possible. Thank you.